IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JENNIFER MARIE HAWLEY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:19-CV-1959-BH |
| | § | |
| ANDREW M. SAUL, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Consent[1] |

**MEMORANDUM OPINION AND ORDER**

Based on the relevant findings, evidence, and applicable law, the Commissioner's decision

is **REVERSED in part and REMANDED**.

**I.  BACKGROUND**

Jennifer Marie Hawley (Plaintiff) seeks judicial review of the final decision of the

Commissioner of the Social Security Administration (Commissioner) denying her claim for

supplemental security income (SSI) under Title XVI of the Act. (doc. 1.)

**A.      Procedural History**

On January 7, 2016, Plaintiff filed her application for DIB, alleging disability beginning on

February 21, 2015. (doc. 14-1 at 208-09.)[2]  Her claim was denied initially on November 18, 2016,

and upon reconsideration on March 8, 2017. (*Id.* at 116, 136.) On April 4, 2017, Plaintiff requested

a hearing before an Administrative Law Judge (ALJ).  (*Id.* at 149-50.)  She appeared and testified

---

[1]By consent of the parties and the order of transfer dated November 1, 2019 (doc. 15), this case has been transferred for the conduct of all further proceedings and the entry of judgment.

[2]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

at a hearing on March 20, 2018.  (*Id.* at 83-100.)  On July 12, 2018, the ALJ issued a decision finding Plaintiff not disabled and denying her claim for benefits.  (*Id.* at 45-63.)

Plaintiff appealed the ALJ's decision to the Appeals Council on July 12, 2018.  (*Id.* at 205-06.)  The Appeals Council denied her request for review on June 27, 2019, making the ALJ's decision the final decision of the Commissioner.  (*Id.* at 6-8.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

B.   **Factual History**

1.   **Age, Education, and Work Experience**

Plaintiff was born on November 1, 1968, and was 49 years old at the time of the initial hearing.  (doc. 14-1 at 87.)  She had a high school education and had completed some college course work.  (*Id.* at 88.)

2.   **Medical Evidence**

From January 2011 through February 2011, Plaintiff saw Nolan B. Jenevein, M.D., for possible multiple sclerosis (MS). (*Id.* at 341-45.) She had a history of fatigue, reduced concentration, leg and hand weakness, and painful sensory dysesthesias, and she reported progression of her symptoms in her hands and difficulty holding a glass. (*Id.* at 343.) She had a history of migraines, which were more frequent with stress. (*Id.*) General examination revealed no edema in her extremities, her concentration was normal, and her mood and affect were calm. (*Id.* at 343-44.) Her motor strength was 5/5 throughout and showed no cogwheeling, no drift, and normal bulk and tone. (*Id.* at 344.) Her reflexes were brisk in the bilateral lower extremities, and her finger-to-nose coordination and rapid alternating movements were intact, with no ataxia. (*Id.*) Her gait and station showed slow walking with plantars downgoing bilaterally. (*Id.*) Plaintiff was assessed with

abnormality of gait, multiple sclerosis, other myclopathy, disorder of optic nerve and visual pathways. (*Id*.) Dr. Jenevein noted there was no evidence to support a finding that her symptoms were related to a demyelinating process. (*Id*. at 342.) An MRI of Plaintiff's thoracic and cervical spine showed degenerative disc disease with partial loss of normal disc height and hydration at T8-T9 and T10-T11, C5-C6 degenerative changes with bilateral neuroformainal stenosis, but no significant impingement or deformation of the spinal cord.  (*Id*. at 346-49.) Plaintiff was advised to undergo reevaluation after 6-12 months. (*Id*. at 342.)

From March 2011 through April 2012, Plaintiff saw Jack B. Vine, M.D., for fibromyalgia. (*Id*. at 351-80.) She reported hurting all over, including in her neck, shoulders, back, hands, MCPs, PIPs, DIPs, wrists, feet, and legs. (*Id*. at 352, 358. ) Dr. Vine noted her complaint of tingling in her fingers with no associated color change. (*Id*. at 372.) Her sensory exam was intact to light touch in the upper and lower extremities, there was no spasticity to range of motion of the upper or lower extremities, there were no significant musculoskeletal abnormalities, her gait was normal, and 14 out of 14 trigger points examined were positive. (*Id*. at 353-54, 359,365-66, 371, 377.) Plaintiff was assessed with polyarthralgias, fibromyalgia, irritable bowel syndrome, mitral valve prolapse, migraines, and fatigue. (*Id*. at 354, 360, 366, 372, 377.)  Dr. Vine recommended a follow up for medical therapy for her fibromyalgia and warm water aquatics as a gradual exercise program, and advised Plaintiff to return if she developed any joint swelling or increasing morning stiffness. (*Id*. at 354, 360, 366-67, 372, 377.)

On August 23, 2012, Plaintiff saw Jamie Talbot, D.C., at KDT Center, for a functional capacity evaluation. (*Id*. at 842-47.)  She completed functional specific tests analyzing her capacity to balance, crawl, keyboard, sit, stand, reach, squat, stoop, and walk. (*Id*. at 448.) She could balance

on her left leg and right leg, but reported that her pain level, which increased during the test, was 7 out of 10. (*Id.*at 343.) Plaintiff could sit for 10 minutes and stand for 10 minutes, but her pain increased during the test to a 9 out of 10. (*Id*. at 448, 845.) She could keyboard for 10 minutes but her pain level increased to a 9 out of 10. (*Id*.) Tightness in her hand increased from a 5 out of 10 pre-evaluation to a 7 out of 10  post-evaluation. (*Id*. at 449, 846.)  Shecould complete 10 minutes of a keyboarding exercise before it was terminated because of fatigue. (*Id*.) Pinch and hand grip testing indicated bilateral weakness, and she could not lift 10 to 20 pounds occasionally. (*Id*. at 487.)  Dr. Talbot opined that Plaintiff should be restricted to no more than 15 pounds of lifting on an occasional basis and 10 pounds on a frequent basis. (*Id*.) He assessed Plaintiff with fatigue, generalized weakness, and inability to engage in sedentary activity (keyboarding), and found it would be difficult for her to maintain work hours and gainful employment. (*Id*.)

In August 2012, Plaintiff saw Nancy A. Didriksen, Ph.D., for a neuropsychological consultation. (*Id*. at 787-810.) Plaintiff had been referred for an evaluation of neurocognitive and personality/behavioral concomitants of fibromyalgia, hypotension, hypoglycemia, migraine headaches, chronic pain, and systemic mycoplasma pneumonia infection. (*Id*. at 787.) The following tests were administered: Wechsler Adult Intelligence Scale-III; Wechsler Memory Scale III (partial); California Verbal Learning Test-II; Wide Range Achievement Test; Benton Visual Retention Test; Grooved Pegboard Test; Test of Memory Malingering; Halstead-Reitan; Neuropsychological Test Battery; PsychEval Personality Questionnaire; and Profile of Mood States. (*Id*.)

Plaintiff reported that she lived with her mother and grandmother; she could drive but limited her driving to short distances in familiar places and avoided driving at night or in heavy traffic, and she did not take vicodin when she needed to drive. (*Id*. at 788.) She had aching and

4

throbbing in the bottom of her feet, reported feeling fatigued on both days of the examination, and reported that her pain and fatigue increased significantly throughout the day. (*Id*. at 789.)

Plaintiff's activities of daily living included taking her dog outside, watching television, and napping. (*Id*. at 794.) She could wash dishes and do laundry and other light cleaning, but she needed an activity-rest cycle and worked no more than 30 minutes before resting. (*Id*. at 794.) She could go grocery shopping with her mother, who typically drove. (*Id*.) She couldn't focus when trying to use the computer, and the position in which she held her head to use the computer exacerbated headaches. (*Id*.) She was able to perform basic self-care independently, including bathing, dressing, washing her face, and brushing her teeth, but she stayed in bed all day on bad days. (*Id*.)

Clinical interview and mental status examination revealed speech normal in quantity and logical in content and progression. (*Id*. at 788.) Plaintiff's motor activity was slowed, her gait was unsteady, and her balance was poor. (*Id*. at 789.) Defense mechanisms did not appear adequate to contain anxiety and depression associated with her ill health and disability. (*Id*.) Pain behaviors, which included rubbing her legs, stretching, and grimacing, were evident on both dates of evaluation. (*Id*. at 789.) Plaintiff also cried during the administration of several of the neuropsychological tests because of the increased pain and/or the perception that she was not performing to expectation. (*Id*.) Her intellectual range, visual-motor-spatial integrating, and analyzing and synthesizing ability were in the high-average range. (*Id*. at 799-800.) Her processing speed was mild to moderately impaired and her petitions and instructions were below average. (*Id*. at 801-02.) She scored in a mildly to moderately impaired range on two measures of incidental memory, and in a low-normal range on measure of sustained attention and concentration for more rapidly presented, nonverbal auditory stimuli. (*Id*. at 802-03.) She was mildly to moderately

impaired on a measure of motor speed of the index finger and moderately to severally impaired on a measure of grip strength, bilaterally. (*Id*.) She was below average with the dominant right hand on a measure of manual speed and dexterity, and average with the non-dominant left hand. (*Id*.)

Dr. Didriksen opined that Plaintiff's personality profile indicated a strong degree of concern with physical dysfunction. (*Id*. at 806.) She was evaluated over a period of two days and provided with a one hour lunch break, but was unable to sustain what would be the equivalent of a normal work day despite rest. (*Id*. at 807.) Pain behaviors, including rubbing her legs, stretching, grimacing, and holding her head down, were evident on both days. (*Id*.) Dr. Didriksen opined that Plaintiff's failing health was the primary factor negatively affecting all aspects of her life; she had a very apparent poor state of physical health and inabilty to maintain adequate pace and persistence, and the reliability and efficiency required in the workplace. (*Id*. at 808.) Plaintiff's slowed information precessing speed and low-normal executive functions argued most strongly against her return to work in her past or relevant work position, or any position. (*Id*.) She opined that Plaintiff was totally disabled, and that her disability would continue into the foreseeable future. (*Id*.)

In August 2014, Plaintiff presented to Methodist Family Health Centers (Methodist) for chronic conditions and fibromyalgia. (*Id*. at 463.) She reported that her fibromyalgia occurred constantly and was stable, but her pain was aggravated by movement and relieved by pain medication. (*Id*.) Her associated symptoms were crepitus and decreased mobility. (*Id*.) She was offered gabapentin, duloxtine, or amitriptyling, but had reportedly had tried all these medications. (*Id*. at 465.) Plaintiff was informed that she would not receive a prescription for hydrocodone for her fibromyalgia, and she became upset and left the exam room. (*Id*.)

From March 2016 through January 2017, Plaintiff saw Philip Chen, M.D., for fibromyalgia

and stiffness in her upper back and shoulders. (*Id*. at 705-710.) Dr. Chen noted that Plaintiff's fibromyalgia was stable and controlled with medication. (*Id*. at 707-10.) An MRI of her cervical spine showed decreased disc height at C4-C5 and C5-C6 levels, a reversal of the normal cervical lordosis, possibly positional in nature, and normal vertebral body height at all levels. (*Id*. at 767.) There were modic type I defenerative endplate changes at C4-C5, C5-C6, and C6-C7 levels, and multiple small subcenflmeter thyroid nodules bilalaterally. (*Id*.)

Dr. Chen opined that Plaintiff's fibromyalgia and chronic fatigue syndrom were disabling conditions that prevented her from engaging in substantial gainful employment because she was limited to lifting greater than 15 pounds occasionally and greater than 10 pounds frequently. (*Id*. at 758.)  When her symptoms were most severe, Plaintiff had an RFC of limited capacity of mobility and range of motion. (*Id*.) Dr. Chen also completed a treating physician migraine headache form, noting that her headaches were variable, occurred more than once a week, and lasted at least 24 hours. (*Id*. at 755.) She saw auras, had N/V, photophobia, phonophobia, and throbbing/pulsating symptoms, and had visited the ER in the last 12 months. (*Id*.) He opined that Plaintiff's migraines would interfere with her ability to work. (*Id*.)

On October 27, 2016, Plaintiff saw Mahmood Panjwani, M.D., P.A., for a consultative examination. (*Id*. at 714-18.) She complained of chronic pain and associated symptoms with a history of fibromyalgia/chronic fatigue, chronic neck pain with history of cervical disc disease, and history of palpitations/tachycardia. (*Id*. at 714.) The most painful areas were her neck, hands, feet. (*Id*. at 715.) She felt achy all the time and had muscle pain in her back that prevented her from sitting more than 15 to 20 minutes. (*Id*.) She reported difficulty looking up, down, and sideways because of her neck pain. (*Id*.) She drove short distances, could take care of her personal care, and

7

stayed at home most of the time. (*Id*.)

Physical examination revealed Plaintiff was ambulatory, cooperative, appropriately dressed, and did not use any assistive device. (*Id*.) She could get on and off the table without much difficulty, her motor strength was 5/5 in all muscle groups tested, and her hand grip was 5/5 normal and symmetric. (*Id*. at 717.) Fine finger movements were normal, and she had normal ability to handle small objects and could fasten buttons on clothing. (*Id*.) She did not appear to have any problems with hearing, vision, speech or fine finger activities. (*Id*. at 718.) X-rays of her cervical spine showed cervical spondylosis, degenerative-appearing minimal spondylolisthesis, and straightening of the normal cervical lordosis, which may have been positional or due to muscle spasm. (*Id*. at 719.)

In September 2017, Plaintiff saw Dr. Chen for a medical release/physician's statement. (*Id*. at 849.) He opined that she could sit, stand, walk, climb stairs/ladders, kneel/squat, bend/stoop, push/pull, use a keyboard, lift/carry for a maximum of two hours per day. (*Id*.) She could not carry more than 10 pounds for more than one hour per day. (*Id*.) Dr. Chen noted unpredictable symptom relapse and remission. (*Id*.)

On January 8, 2018, Dr. Chen completed a physical RFC questionnaire. (*Id*. at 862.) He opined that Plaintiff could sit and stand/walk for two hours in an eight-hour work day, and lie down/recline for four hours. (*Id*.) She would need to alternate between sitting and standing as needed/at will, and could occasionally carry up to 10 pounds, but never carry above 10 pounds because of pain. (*See id*. at 862-63.) She could reach frequently and occasionally handle objects and finger. (*Id*. at 863.) On average, Plaintiff's degree of pain was severe, and she would be off task over 15 minutes per hour due to pain and would frequently require unscheduled rest breaks. (*Id*. at 863-64.)

### 3.   **Hearing**

On March 20, 2018, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (*Id.* at 83-100.)  Plaintiff was represented by an attorney.  (*Id.* at 85.)

#### a.   **Plaintiff's Testimony**

Plaintiff testified that she was 49 years old, divorced, and lived with her mother and grandmother. (*Id.* at 87-88.) She was 5'1" tall, weighed approximately 115 pounds, and was right-handed. (*Id.* at 88.) She had worked as an accounting specialist for Dr. Pepper Snapple Group for two and a half to three years. (*Id.* at 89.) She had also worked at the Muscular Dystrophy Association for over seven years as assistant manager of accounts payable. (*Id.*)

The most significant problems preventing Plaintiff from working were neck pain, headaches, fatigue, and pain in her hands from any repetitive tasks. (*Id.* at 89.) Her treatment for her neck pain included prescription muscle relaxers and painkillers, a soft collar worn at night, and neck exercises to strengthen her neck muscles. (*Id.* at 89-90.) Most of the day she rested on the sofa, leaning back with a pillow behind her neck and head. (*Id.* at 90.) She could do a load of laundry but then would need to rest for half an hour to an hour. (*Id.*) She had to do a "work/rest cycle" to get her dishes and laundry done. (*Id.*) Her pain could be triggered from not sleeping well, standing too long, and sitting for more than 30 minutes at a table or desk if she did not recline. (*Id.*) Sitting or standing more than 15 or 20 minutes triggered neck pain that radiated through her shoulder and down her arm, headaches, and at times vertigo. (*Id.*) She experienced headaches four to five times a week, and they increased in frequently and duration. (*Id.* at 90-91.) To treat her headaches, Plaintiff took muscle relaxers and hydrocodone pain medication, and supported her head while resting. (*Id.*) If she tried to get up and push herself while she had a headache, she felt nauseated and "dizzy to the point of

Case 3:19-cv-01959-BH   Document 22   Filed 11/06/20   Page 10 of 21   PageID 984

throwing up." (*Id*. at 91.)

There were days when Plaintiffs's arms and hands were extremely weak. (*Id*.) Several days a week, her hands were so weak that she could not pick up a glass of water. (*Id*.) She lost "a lot of the dexterity, especially if [she was] trying to write something or type something," or trying to cook. (*Id*.)  She had pain in her hand within 5 to 10 minutes of trying to write. (*Id*.) She had chronic fatigue syndrome that caused overwhelming fatigue and weakness, which affected her concentration. (*See id*. at 92-933.) She took a lot of naps during the day, and on the days when she experienced the most severe fatigue, she slept almost all day. (*Id*. at 94.)

Plaintiff had pain in her hands, feet, legs, hips, and her back. (*Id*. at 93.) She also experienced blurred vision that was believed to be caused by her fibromyalgia, irritable bowel syndrome, swelling of her feet, and numbness and tingling in her fingers. (*Id*. at 94-95.) Her fatigue, neck pain, and headaches were aggravated by stress. (*Id*. at 96.) Her primary care physician was Dr. Chen; she did not see any specialist because she couldn't afford it. (*Id*.)

### b.    VE's Testimony

The VE testified that Plaintiff had past work experience as an accounting supervisor, dictionary of occupational title (DOT) 216.132-010 (sedentary, SVP-7); and accountant, DOT 160.162-018 (sedentary, SVP-8). (*Id*. at 97-98.)

The VE considered a hypothetical individual with the same age, education and work background as Plaintiff, who could lift and carry 10 pounds occasionally and less than 10 pounds frequently; could stand and walk with normal breaks at least two hours in an eight-hour workday; sit with normal breaks for six hours in an eight-hour workday; had no additional limitations regarding pushing, pulling and operation of hand and foot controls; was capable of occasionally

climbing ramps and stairs; could not climb ladders, ropes or scaffolds; could occasionally balance, stoop, kneel, and crouch; and must avoid exposure to hazardous, moving machinery or unprotected heights. (*Id*. at 98.) This individual could perform all of Plaintiff's past work. (*Id*.)

The VE next considered a hypothetical individual who could occasionally lift and carry 10 pounds, stand and walk for two hours in an eight-hour workday, and sit two hours in an eight-hour workday. (*Id*.) The VE testified that this individual would not be able to perform any of Plaintiff's past work, or any other full-time competitive work in the economy. (*Id*.)

In response to questioning by Plaintiff's attorney, the VE considered a hypothetical individual with a sedentary RFC who would be limited to occasional handling and fingering, needed to alternate between sitting and standing at will; needed to rest her head against an object like a headrest while reclining; needed four to six unscheduled breaks of about 15 minutes; and would have her pace and productivity reduced by about 20 percent. (*Id*. at 99.) The VE testified that the hypothetical individual would not be able to perform any past work or any other work. (*Id*.)

## C.   <u>ALJ's Findings</u>

The ALJ issued his decision denying benefits on July 12, 2018.  (*Id*. at 45-63.)  At step one, he found that Plaintiff had not engaged in substantial gainful activity from her alleged onset date of February 21, 2015, through her date last insured of December 31, 2016.  (*Id.* at 50.)  At step two, the ALJ found the following severe impairments: degenerative disc disease of the spine, fibromyalgia, migraine headaches, chronic fatigue syndrome, tachycardia, benign positional vertigo, and history of mitral valve prolapse. (*Id*.) Despite those impairments, at step three, he found that Plaintiff had no impairments or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations.  (*Id.* at 51.)

11

Next, the ALJ determined that Plaintiff retained the RFC to perform sedentary work, could lift/carry 10 pounds occasionally and less than 10 pounds frequently, stand/walk for at least two hours in an eight-hour workday, and sit for six hours in an eight-hour workday. (*Id*. at 51.) She could occasionally climb ramps and stairs, balance, stoop, and kneel. (*Id*.) She could not climb ladders, ropes, or scaffolds, and must avoid exposure to hazardous moving machinery and unprotected heights. (*Id*.)  At step four, the ALJ found that Plaintiff was capable of performing past relevant work as an accounting supervisor and an accountant. (*Id*. at 57.) At step five, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, at any time from February 21, 2015, the alleged onset date, through December 31, 2016, the date last insured. (*Id*.)

## II.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).[3]  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible

---

[3]The scope of judicial review of a decision under either the supplemental security income program or the social security disability program is the same. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  The relevant law and regulations governing the determination of claims under either program are also identical, so courts may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability.

*Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id*.  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.  ISSUES FOR REVIEW

Plaintiff presents two issues for review:

1. The Social Security Act requires consideration of all evidence in the claimant's case record. In this case, Plaintiff submitted functional and neurocognitive test results indicating she was unable to sustain competitive activity and was unable to effectively use her hands due to pain and fatigue. Did the ALJ reversibly err by failing to reconcile this evidence with his finding that Plaintiff could return to work as an accountant?

2. Case law prohibits the ALJ from rejecting a medical opinion without an explanation, and the ALJ's explanation should address all the factors set forth at Section 404.1527(c). In this case, Plaintiff submitted over ten opinions from her treating physician, who indicated she was unable to perform sedentary work. Did the ALJ reversibly err when he discussed only two of the opinions, which he rejected without specifically discussing the Section 404.1527(c) factors?

(doc. 19 at 5.)

### A.    Treating Source Opinion

Plaintiff argues that the "ALJ failed to apply the correct legal standard to the medical source statement's from [Plaintiff's] treating physician, which were either ignored outright or discounted

14

without conducting the detailed analysis under Section 404.1527." (doc. 19 at 17.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. § 404.1529(b). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. *Id*. § 404.1527(c)(2).[4] A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id*. § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id*. § 404.1527(c)(2). If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id*. § 404.1527(c)(1)–(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ.

---

[4]On January 18, 2017, the Administration updated the rules on the evaluation of medical evidence. *See* 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017). For claims filed on or after March 27, 2017, the rule that treating sources be given controlling weight was eliminated. *See Winston v. Berryhill*, 755 F. App'x 395, 402 n.4 (5th Cir. 2018) (citing 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)"). Because Plaintiff filed her application before the effective date, the pre-2017 regulations apply.

*Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id*. A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id*. at 455–56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id*. at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id*. at 458.

Here, Dr. Chen was Plaintiff's primary care physician since February 2009, and treated her for fibromyalgia and chronic fatigue syndrome. (*Id*. at 705-07, 709, 759-61, 866.) From October 2014 through January 2018, he completed multiple questionnaires regarding Plaintiff's physical limitations. (*Id*. at 758, 765, 849-52, 858-60, 862-64.) He opined that Plaintiff could not lift/carry more than 10 pounds for more than one hour per day, she was limited to lifting greater than 15 pounds occasionally, and no greater than 10 pounds frequently. (*Id*. at 758, 765,852, 859-60.) At her most severe, Plaintiff had limited capacity of mobility and range of motion. (*Id*. at 758.) Plaintiff was limited to no more than two hours a day of standing, kneeling/squatting, pushing/pulling, lifting/carrying, and keyboarding. (*Id*. at 851, 859.) Dr. Chen completed a physical RFC

questionnaire oping that Plaintiff was limited to only occasionally handling objects and fingering. (*Id*. at 863.) Plaintiff's pain was on average severe, she would be off task for over 15 minutes per hour, would require frequent rest breaks, and would miss four or more days per month. (*Id*. at 863-64.)

The ALJ specifically identified two opinions that he found warranted little weight because one opinion was vague and the second was largely based on Plaintiff's "uncorroborated subjective complaints and testing outside the period under consideration here[.]" (*Id*. at 57.) The ALJ noted that Dr. Chen's opinion was based on a 2012 functional capacity evaluation and a 2012 neuropsychological examination. (*Id*.) The neuropsychological examination included a summary and conclusion based on objective testing that found that Plaintiff scored in the mildly to moderately impaired range on a measure of motor speed of the index finger; and below average with her dominant right hand on a measure of manual speed and dexterity. (*Id*. at 803.) Plaintiff's grip strength was moderately to severely impaired and she was "most impaired on measures of Processing Speed, consistent with self-report of dysfunction." (*Id*. at 805-06.) "[M]edical opinions may not be ignored just because they predate the disability onset date[,]" however. *Davidson v. Colvin*, 164 F. Supp. 3d 926, 941–42 (N.D. Tex. 2015) (agreeing with the conclusions from other circuit courts that "[a]n ALJ may not simply ignore medical opinions because they pre-date the onset of disability or post-date the last insured date, since that evidence can be relevant to a claim of disability."). Dr. Chen identified objective testing to support his functional capacity determinations. The ALJ failed to explain his reasons for rejecting Dr. Chen's more detailed opinions, other than noting that the testing fell outside the period under consideration.

Morever, the ALJ did not address the other opinions from Dr. Chen in determining Plaintiff's

17

RFC, and he did not weigh his opinions against opinions of any other treating or examining physician. (*See id*. at 57.) These opinions listed multiple limitations including inability to sit or stand longer than 15 minutes before needing to change positions, and a maximum keyboarding of two hours in a work day. (*Id*. at 849, 851, 858, 862.) He did not provide any explanation as to why he did not consider or even discuss the other opinions from Dr. Chen. *See Kneeland v. Berryhill*, 850 F.3d 749, 760 (5th Cir. 2017) ("And fundamentally, '[t]he ALJ cannot reject a medical opinion without an explanation.' ").

Rather, the ALJ relied on the SAMC's opinions that Plaintiff could perform duties at the sedentary exertional level. (*Id*. at 21.) The SAMCs are non-examining physicians, however, and "their opinions provide no basis to bypass the requisite detailed analysis." *Perry v. Colvin*, No. 13-CV-2252-P, 2015 WL 5458925, at *9 (N.D. Tex. Sept. 17, 2015) (citing *Newton*, 209 F.3d at 456–58, 460; *Meyers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001)); *see Kneeland*, 850 F.3d at 761 ("the reports of physicians who did not examine the claimant, taken alone, would not be substantial evidence on which to base an administrative decision." (internal quotations omitted)) (quoting *Strickland v. Harris*, 615 F.2d 1103, 1109 (5th Cir. 1980)).

Because Dr. Chen's opinions were not controverted by first-hand medical evidence, and were supported by the record, the ALJ was required to perform the six-factor analysis of 20 C.F.R. § 404.1527(c)(1)-(6) before rejecting those opinions. *See Newton*, 209 F.3d at 453–55. Instead, the ALJ specifically assigned weight to only two opinions. There is no indication from the ALJ's short narrative discussion that he did that he considered Dr. Chen's other opinions contained in the record. The ALJ rejected them without discussion by finding that Plaintiff could perform sedentary work, which requires the capacity to sit for 6 hours in an 8–hour workday and stand/walk for at least 2

18

hours in an 8–hour workday. (*See* 14-1 at 51); *see also* 20 C.F.R. § 404.1567(b). By failing to properly evaluate Dr. Chen's treating opinions under 20 C.F.R. § 404.1527(c), the ALJ committed error.

## B.    <u>Harmless Error</u>

Having found error, the Court must still consider whether the ALJ's failure to address or properly evaluate Dr. Chen's opinions was harmless. *See Kneeland*, 850 F.3d at 761-62 (applying harmless error analysis where the ALJ failed to address or evaluate an examining physician's opinion); *McNeal v. Colvin*, 3:11-CV-02612-BH-L, 2013 WL 1285472, at *27 (N.D. Tex. Mar. 28, 2013) (applying harmless error analysis to the ALJ's failure to properly evaluate treating opinion under 20 C.F.R. § 404.1527(c)).

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected." *Mays v. Bowen*, 837 F.2d 1362, 1363-64 (5th Cir. 1988). "[E]rrors are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. Nov. 28, 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)). Accordingly, to establish prejudice that warrants remand, Plaintiff must show that the ALJ's decision might have been different had he addressed or properly considered Dr. Chen's opinions regarding her functional limitations. *See id*. at 816 (citing *Newton*, 209 F.3d at 458).

As noted, Dr. Chen opined that Plaintiff could sit, stand, walk, and keyboard for a maximum

of two hours in a workday because of her fibromyalgia and chronic fatigue syndrome. (doc. 14-1 at 869.) He also opined that Plaintiff had unpredictable symptom relapse and remission. (*Id*.) The ALJ did not address these opinions from Dr. Chen. (*See id*. at 57.) "[S]uch an error makes it impossible to know whether the ALJ properly considered and weighed an opinion, which directly affects the RFC determination." *Kneeland*, 850 F.3d at 762.

It is not inconceivable that the ALJ would have reached a different conclusion had he considered Dr. Chen's opinions. *See id*. (stating that if the examining physician's opinions were "afforded some weight, the ALJ's RFC would surely have been different.").  It is not inconceivable that he might have increased the limitations to Plaintiff's abilities to handle, finger, sit, stand, or walk in the RFC. *See McAnear v. Colvin*, No. 3:13-CV-4985-BF, 2015 WL 1378728 at *5 (N.D. Tex. Mar. 26, 2015) (finding remand was required because there was a realistic possibility of a different conclusion by the ALJ where the court was unsure of whether the ALJ considered the medical source's opinion and whether such a review would have changed the outcome of the decision).  "This in turn, would likely have affected the jobs available at step five of the sequential evaluation process, and [Plaintiff] may have been found disabled." 850 F.3d at 762. Moreover, the VE testified that an individual limited to occasionally handling, occasional fingering, who would to alternate between sitting and standing at will, and had her pace and productivity reduced by about 20 percent, could not maintain employment. (*See* doc. 14-1 at 99.) The ALJ's error was not harmless because it is not inconceivable that he would have reached a different decision had he addressed and explained the weight given to Dr. Chen's opinions, or formally considered his opinions under 20 C.F.R. §§ 404.1527(c) and 416.927(c). *See Kneeland*, 850 F.3d at 761-62 (finding that the error was not harmless where the ALJ failed to address or properly consider an examining physician's

opinion); *see also Singleton v. Astrue*, No. 3:11-CV-2332-BN, 2013 WL 460066, at *6 (N.D. Tex. Feb. 7, 2013) (finding the ALJ's failure to consider a medical source opinion was not harmless error because the court could not say what the ALJ would have done had he considered the opinion, and had he considered the opinion he might have reached a different decision). Accordingly, the error is not harmless, and remand is required on this issue.[5]

## IV.  CONCLUSION

The Commissioner's decision is **REVERSED in part and REMANDED**.

**SO ORDERED**, on this 6th day of November, 2020.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[5]Because the ALJ's consideration of the treating source's opinions may affect determination of Plaintiff's RFC, it is unnecessary to address the first issue.

21